UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

GEORGE BASTONE, et al.,

Plaintiffs,

v.

THE CATHOLIC DIOCESE OF KNOXVILLE, et al.,

Defendants.

No. 3:19-CV-232-HBG

**MEMORANDUM AND ORDER**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 15].

Now before the Court is Plaintiffs' Motion to Exclude Portions of the Proposed Expert Testimony of Tara Amenson [Doc. 57] and Defendants' Motion to Exclude Testimony of Corey Andres [Doc. 58]. The parties appeared before the Court on September 13, 2021, for a motion hearing. Attorneys David Burkhalter and Zachary Burkhalter appeared on behalf of Plaintiffs, and Attorneys Beecher Bartlett, Jr., and Edward Phillips appeared on behalf of Defendants. Accordingly, for the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion [**Doc. 57**] and **DENIES** Defendants' Motion [**Doc. 58**].

## I. BACKGROUND

The facts in this matter are straightforward. On June 25, 2014, Plaintiff A.B., who was nine (9) years old at the time, attended Defendants' Vacation Bible School ("VBS") program. Plaintiff A.B. was injured when she played the Dizzy Izzy/Gone Batty game ("Game").

Defendants originally planned to play the game outside, but due to inclement weather, the Game was moved to a classroom. To play the Game, Defendants instructed the children to bend at the waist and place their foreheads on an upright plastic baseball bat and spin around the bat multiple times. The children then attempted to walk/run to a finish line. When Plaintiff A.B. played the game, she fell and her left hip directly impacted the bent knee of a child who was sitting on the floor. Plaintiff A.B. suffered a broken left hip when it impacted the child's bent knee. Unknown to Plaintiff A.B. or her parents, she had a preexisting condition in her left hip that made her hip more likely to fracture from direct trauma.

Relevant to the instant matter, Plaintiffs retained Corey Andres ("Andres"), a sports and recreation expert, and Defendants retained Tara Amenson ("Amenson"), a biomedical safety consultant, to testify in this case. The parties have each challenged the opposing party's expert's opinions.

## II. STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 589 (1993)). Specifically, Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert*, the Supreme Court of the United States stated that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The Daubert standard "attempts to strike a balance between a liberal admissibility standard for relevant evidence on the one hand and the need to exclude misleading 'junk science' on the other." *Best v. Lowe's Home Ctrs., Inc.,* 563 F.3d 171, 176–77 (6th Cir. 2009).

The factors relevant in evaluating the reliability of the testimony, include: "whether a method is testable, whether it has been subjected to peer review, the rate of error associated with the methodology, and whether the method is generally accepted within the scientific community." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970-71 (M.D. Tenn. 2002) (citing *Daubert*, 509 U.S. at 593–94). Rule 702 inquiry as "a flexible one," and the Daubert factors do not constitute a definitive checklist or test. *Kumho Tire Co.*, 526 U.S. at 138-39 (citing *Daubert*, 509 U.S. at 593); *see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999) (explaining that these factors "are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted").

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cty., Tenn.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138-39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that

will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey*, 187 F. Supp. 2d at 70-71 (quoting *Daubert*, 509 U.S. at 593-94). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n. 10.

Moreover, the Supreme Court has explained that in determining "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact," the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and whether it can properly be applied to the facts in issue." *Id*. at 592–93. "Furthermore, the court must examine the expert's conclusions in order to determine whether they can reliably follow from the facts known to the expert and the methodology used." *In re Diet Drugs*, No. MDL 1203, 2001 WL 454586, at *7 (E.D. Pa. Feb. 1, 2001) (citing *Heller*, 167 F.3d at 153).

Further, a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise." *In re Diet Drugs*, 2001 WL 454586, at *7 (quoting 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000)). This simply means that "a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." Id. (other citations omitted).

Finally, "the court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc*., 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). Exclusion is the exception, not the rule, and "the gatekeeping function established by Daubert was never 'intended to serve as a replacement for the adversary system.'" *Daniels v. Erie Ins. Group*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. Dec. 4, 2017) (quoting *Rose v. Matrixx Initiatives*, Inc., No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009)) (other quotations omitted). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional

and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Rule 702 does not "require anything approaching absolute certainty." *Daniels*, 291 F. Supp. 3d at 840 (quoting *Tamraz v. Lincoln Elec. Co.,* 620 F.3d 665, 671–72 (6th Cir. 2010)).

## III. ANALYSIS

The Court has considered the parties' filings and the oral arguments presented at the motion hearing. Accordingly, for the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion [**Doc. 57**] and **DENIES** Defendants' Motion **[Doc. 58].**

The Court will address the Motions in the order in which they were filed.

### A. Tara Amenson

Plaintiffs move to exclude any and all Amenson's reports, opinions, and testimony regarding or concerning: (1) medical opinions, (2) the alleged effects on childhood development of playing the Game, (3) the alleged effects on childhood development with respect to sitting in a circle knee-to-knee, (4) that children are at a greater risk for fractures when using playground equipment, and (5) hip forces of children during recreational activities.

With respect to Plaintiffs' first objection, they object to Amenson's use of the word "healthy" during her deposition. Plaintiffs state that Amenson is not qualified to use this term because she is not a physician. During Amenson's deposition, she testified that she would not expect a healthy child to be injured if the child fell onto another child. She also stated that at the time of the incident, Plaintiff A.B. was not healthy because Plaintiff A.B. had a cyst. The Court will not preclude Amenson from using the words "healthy" or "unhealthy." The context in which Amenson used the words does not call for an expert opinion and is simply an observation about an undisputed fact (*i.e.,* that Plaintiff A.B. had a preexisting condition). Similarly, Plaintiffs argue that Amenson cannot testify whether children would likely be injured by falling in the manner that

Plaintiff A.B. fell. Given that Amenson has a masters and doctoral degree in biomedical engineering with a concentration in impact biomechanics, the Courts declines to exclude such testimony. Further, Plaintiffs object that Amenson's testimony regarding whether a healthy child would be injured after a fall is speculative, arguing that she relied on a test that was not similar to the circumstances in which the instant fall occurred. As further explained below, the Court finds that Plaintiffs can address these issues during their cross examination of Amenson.

In addition, Plaintiffs object to Amenson's opinions regarding the alleged effect of playing the Game on childhood development and the alleged effect on childhood development with respect to sitting knee-to-knee in a circle. Specifically, Amenson states that the Game "provides children with an opportunity to learn risk assessment early in their development so that they know how to judge risk and consequences in the future." [Doc. 57-1 at 5]. In addition, Amenson states, "Positioning children in a knee-to-knee circle in an indoor or outdoor environment is appropriate as it is reasonably safe and promotes inclusion and discussion, boosts self-esteem, and encourages development of social skills." [*Id.*].[1]

Plaintiffs argue that Amenson has no background in childhood development, offers no foundation to support these conclusions, and her opinions regarding childhood development are irrelevant. Defendants respond that Amenson's opinion is based on common background principles in her field as a safety expert and that her report explains her methodology. Defendants argue that Amenson is qualified by her education, knowledge, and experience to opine on the positive risk analysis experience in playing the Game. Defendants assert that such opinions are

[1] Plaintiffs do not contest that Amenson can offer her opinions that sitting in a circle is reasonably safe. [Doc. 75 at 9] (Plaintiffs' Reply) ("First, to clarify, Plaintiffs will not contest that Amenson can offer her opinion that sitting in a circle is 'reasonably safe' as the bulk of such challenges would only go to Amenson's credibility.").

relevant to address Plaintiffs' argument that the Game was dangerous and unsafe. Finally, Defendants state that according to the Fiissel Report, relied on by Amenson, "[C]hildhood play is essential for the development of cognitive, psychosocial, and physical skills and it is important that children be provided with safe play environments. Playgrounds are one area that provides opportunities for skill development but several playground activities are common." [Doc. 72 at 124].

Generally, the Court finds that testimony regarding why the Game was played is relevant to weighing the risks versus benefits of the Game. With respect to Amenson's testimony, however, there are two issues. First, it is not clear to the Court whether Amenson's opinion is based on why this Game was specifically chosen by Defendants and played during VBS. For instance, even if this Game supports positive childhood development, such is only relevant if Defendants took that into consideration when deciding to play the Game. Second, the Court does not find Amenson to be qualified to render opinions regarding childhood development. *In re Diet Drugs*, 2001 WL 454586, at *7 (explaining that a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise") (quotations omitted). The Court agrees with Plaintiffs that allowing Amenson to testify simply because she reviewed a publication would circumvent the *Daubert* standards.

Accordingly, the Court finds Plaintiffs' arguments well taken on this issue, and the Court will preclude Amenson from testifying that the Game provides children with an opportunity to learn risk assessment early in their development so that they know how to judge risks and consequences in the future and positioning children in a knee-to-knee circle in an indoor or outdoor environment is appropriate promotes inclusion and discussion, boosts self-esteem, and encourages development of social skills.

Further, Plaintiffs object to Amenson's opinion that "[c]hildren are at a greater risk for higher severity fractures when using playground equipment compared to standing falls." [Doc. 57-1 at 6]. Plaintiffs state that this opinion is not relevant because Plaintiff A.B. was not injured on a playground, and this opinion will mislead the jury. In addition, Plaintiffs argue that Defendants cannot avoid liability simply because Plaintiff A.B. suffered a worse injury due to her preexisting condition as that is a misapplication of Tennessee law.

Defendants respond that such testimony is relevant, stating that given the rare occurrences of pediatric femoral fractures, there are no studies researching the likelihood of a healthy child fracturing her hip from a low-energy mechanism. Defendants state that, therefore, Amenson has relied on the Fiissel Report, which concluded that the majority of fractures were strongly associated with falls from playground equipment, whereas minor fractures come from both playground equipment and standing height falls. Defendants argue that such testimony is relevant to several issues, including: (1) whether it was foreseeable that Plaintiff A.B. would have fractured her hip from a standing height fall; (2) the recreational activities that Plaintiff A.B. actively engaged in, including playground equipment, from which a fall was far more likely to cause a major fracture; (3) to rebut Andres's opinion that the Game as it was played was unsafe and dangerous; and (4) the breach of duty of care and foreseeability that a participant would fracture a hip from the low impact of falling from a standing height.

Given Defendants' reasons in support of Amenson's testimony, the Court declines to exclude it from trial. Although Plaintiffs argue that such testimony is a misapplication of Tennessee law, any alleged misapplication can be addressed through cross examination and proper jury instructions. Accordingly, the Court finds Plaintiffs' arguments are not well taken on this issue.

Finally, Plaintiffs object to Amenson's opinion that "[c]ommon recreational activities with single leg loading such as walking and running potentially expose children to greater hip forces than would be expected during double leg loading activities." [Doc. 57-1 at 20]. In support of Amenson's opinion, she evaluated the estimated forces generated by the hip during recreational activities, utilizing the "XSens Inertia Motion-Capture System," ("System"), which tested three female children who performed various recreational activities, including normal, walking, running/jogging, jumping jacks, a cartwheel, jumping up and down on a trampoline, and jumping on and off of a trampoline and a two-foot-high box. [*Id.* at 19-20]. The test measures the contact force in the hip joint in newtons. [*Id.*].

Plaintiffs state that Amenson's opinion is a medical opinion, and therefore, she is not qualified. The Court disagrees. As mentioned above, Amenson has a masters and doctoral degree in biomedical engineering with a concentration in impact biomechanics, and therefore, the Court finds her qualified to provide such testimony. In addition, Plaintiffs argue that Amenson's reasoning and methodology underlying the tests are not reliable or applicable in this case and that she did not perform a test in the manner in which Plaintiff A.B. was actually injured. Defendants respond that Amenson tested her hypothesis (*i.e.*, one would not expect a healthy, active nine-year old female to sustain a hip fracture by falling onto another child's knee) by evaluating the forces on a child's hip during vigorous activities. The Court finds Plaintiffs' objections regarding the testing go to the weight of the testimony and not to its admissibility. Plaintiffs may cross examine Amenson on this issue. Finally, Plaintiffs argue that the testimony should be excluded because the relative hip force on other children has no bearing on this case, but given Defendants' theory outlined in the Pretrial Order, *see* [Doc. 74], the Court declines to exclude Amenson's opinions on

such grounds. Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion [**Doc. 57**].

**B. Corey Andres**

Defendants assert three main challenges to Andres's opinions. Defendants argue that Andres did not conclude that Defendants' actions caused Plaintiff A.B.'s left femur fracture but instead opined that Defendants' actions merely "increased" the risk of injury. Defendants argue that an increased risk of injury is not sufficient to state a cause of action for negligence in Tennessee. Second, Defendants argue that Andres is not qualified by education or experience to testify on causation where the medical records and expert medical opinions reflect that Plaintiff A.B. suffered a traumatic fracture caused by a preexisting cyst. Third, Defendants challenge Andres's opinions on causation, stating that they are not the product of reliable principles and methods.

In the instant matter, Andres states that the purpose of his report is to determine whether Defendants' inactions or actions were improper and whether they created a dangerous condition that caused Plaintiff A.B.'s injuries. [Doc. 58-1 at 1]. Andres provides the following conclusions:

> 1. The All States Catholic Church day camp program created a dangerous condition that increased the inherent risk of a child injury by conducting a recreational activity designed to encourage participant dizziness before running in a classroom filled with numerous hazards.
>
> 2. The All Saints Catholic Church day camp's failure to evaluate and mitigate the risk of injury to [Plaintiff A.B.] and other participants was improper and deviated from the standard of care for a recreational environment. This created a dangerous condition that increased her risk of injury.

[*Id.* at 4]. In rendering these conclusions, Andres considered Plaintiffs' statements, a letter from Plaintiffs' counsel, the Game's program description, a photograph of the classroom, and a diagram of the classroom. [*Id.* at 1].

First, Defendants state that Andres concludes that Defendants' actions "increased the risk of the child's injury" and/or "created a dangerous condition that increased the risk of injury." [*Id.* at 4]. Defendants argue that an increased risk of injury is not sufficient to state a cause of action for negligence under Tennessee law. Defendants argue that in order to be relevant, Andres must testify that the fall on the child sitting on the floor more likely than not caused the fracture. The Court finds Defendants' argument is not a reason to exclude Andres's testimony. Instead, the Court finds the jury will hear and weigh the evidence, and the undersigned will instruct the jury on the applicable law. The Court further notes that the parties have filed their Pretrial Order, *see* [Doc. 74], and Andres's testimony is relevant to Plaintiffs' theory of the case as stated therein.

Defendants continue that Andres did not examine the room, has no knowledge of how the children were seated at the time of the incident, he did not know how the child that Plaintiff A.B. fell on was sitting, and he did not perform any testing. Andres stated during his deposition that the presence of the children was the hazard. The Court finds Defendants' objections better suited for cross examination and not reasons to exclude his opinion. *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (noting that the "court will not exclude expert testimony merely because the factual bases for an expert's opinion are weak"). Further, it appears to the Court that Defendants' objection is simply a disagreement with Andres's conclusion, which is also not a reason for exclusion.

Defendants continue that Andres is not familiar with the medical records in this case, or with Plaintiff A.B.'s medical condition, or the necessary forces that come into play when a child

falls. Defendants take issue with Andres's statement regarding the purpose of his report (*i.e.*, whether Defendants' actions were improper and created a dangerous condition that *caused the injuries*). While Andres uses the phrase "caused [Plaintiff A.B.'s] injuries," Andres's conclusions, are simply related to whether Defendants had a duty of care, whether they breached their duty of care, and whether an injury was foreseeable. It does not appear to the Court that Andres is offering medical causations opinion, nor could he as he is not qualified. If such opinions are elicited at trial, Defendants may object at that time. The Court finds Andres qualified to render testimony regarding the duty, the breach of duty, and whether an injury was foreseeable. As Plaintiffs point out, Andres has a background in education, coaching, and recreational youth activities that qualify him to opine on the safety of such youth recreational activities.

Similarly, Defendants further assert that the Court should find Andres unqualified to render an opinion that falling on the child's knee was the probable cause of Plaintiff A.B.'s pathologic femur fracture. Plaintiffs, however, have acknowledged that they "are not offering Andres for the purpose of a medical conclusions or opinions as to the causation of A.B.'s fractured hip—the treating doctors will do that." [Doc. 71 at 6]. In addition, Plaintiffs state that Andres is not testifying whether this accident would more likely than not have fractured the hip of a normal, healthy nine-year-old child." [*Id.* at 10]. Accordingly, given that Andres will not offer such opinions at the trial, the Court finds Defendants' arguments not well taken at this time. At trial, if Andres's testimony moves into the realm of medical opinions, Defendants may object.

Finally, Defendants state that Andres's testimony has been excluded in two other cases. Defendants, however, have not provided any citations directing the Court to specific cases, and Defendants have not explained why Andres's testimony was previously excluded. Accordingly, the Court finds Defendants' arguments not well taken, and their Motion [**Doc. 58**] is **DENIED**.

## IV. CONCLUSION

Accordingly, for the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion to Exclude Portions of the Proposed Expert Testimony of Tara Amenson [**Doc. 57**] and **DENIES** Defendants' Motion to Exclude Testimony of Corey Andres [**Doc. 58**]. The Court further finds that should any expert testify as to legal conclusions during the trial, the parties may object at that time.

**IT IS SO ORDERED.**

ENTER:

United States Magistrate Judge